# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

SHARON KAY SMITH,           )
                            )
            Petitioner,     )
                            )
v.                          )        **Case No. CIV 09-455-RAW-KEW**
                            )
RICKEY MOHAM, Warden,       )
                            )
            Respondent.     )

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Petitioner, an inmate currently incarcerated at Mabel Bassett Correctional Center in McLoud, Oklahoma, attacks her conviction in Sequoyah County District Court Case No. CF-05-340 for Child Abuse (Count 1), Child Neglect (Count 2), and Permitting Child Abuse (Count 3). She sets forth the following grounds for relief:

> I.    Plain error occurred when the jury was insufficiently instructed on the law. The trial court failed to instruct the jury as required under the law. The trial court erred when it failed to define numerous terms found within the jury's instructions. The instructions as a whole failed to fairly and accurately state and define the law for the jury.

> II.   The evidence was insufficient to sustain the convictions, because the State had to rely on the incredible testimony of a child who was four years old when the alleged abuse by Ms. Smith occurred. The child was six years old when he testified at trial. The child's testimony regarding Ms. Smith was unworthy of belief and a reasonable jury would not have found her guilty.

> III.  Prosecutorial misconduct denied Ms. Smith's right to a fair trial. The prosecutor made unduly prejudicial and improper remarks to the jury during Ms. Smith's trial, which rendered proceedings unfair and unjust. In particular, during his opening statement, the prosecutor mentioned Nazi crimes to improperly prejudice Ms. Smith.

> IV.   Ms. Smith received ineffective assistance of trial counsel in violation of her constitutional rights. Trial counsel failed to object to jury instructions and/or submit proposed written instructions and failed to object to prosecutorial misconduct.

> V.    Trial errors cumulatively denied rights to a fair trial. A review of the

entire record reveals that there were numerous irregularities and errors that unduly prejudiced Ms. Smith's rights.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review, and the following documents have been submitted to the court for consideration in this matter:

A.     Petitioner's direct appeal brief.

B.     The State's brief in petitioner's direct appeal.

C.     Summary Opinion affirming petitioner's Judgment and Sentence. *Smith v. State*, No. F-2007-875 (Okla. Crim. App. Dec. 23, 2008).

D.     Photocopies of certain State's exhibits.

E.     Jury Instructions Nos. 7-9.

F.     Transcripts of petitioner's jury trial and sentencing.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**Ground I: Jury Instructions**

Petitioner alleges in Ground I that the trial court failed to instruct the jury properly, because the definitions of several terms or phrases were omitted from the instructions. She specifically complains that the instructions did not define the terms "abuse," "harm or threatened harm to a child's health or safety," "neglect," "person responsible for a child's health, safety or welfare," "willfully," and "malicious."

On direct appeal the Oklahoma Court of Criminal Appeals (OCCA) denied relief on

this claim:

> The terms "abuse," "harm/threatened harm," and "neglect" were defined in Instructions Nos. 7-9 through the elements of the offense. The trial court's failure to define the term "person responsible for a child's health, safety, or welfare" does not rise to the level of plain error because the evidence showed and Smith concedes she was a babysitter and we have held that a babysitter is a person responsible for a child's health, safety, or welfare. The court's failure to define the terms "willfully" and "maliciously" likewise fail to rise to the level of plain error.

*Smith v. State*, No. F-2007-875, slip op. at 2 (footnotes and citations omitted). The OCCA's factual findings are entitled to a presumption of correctness, unless petitioner produces clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1).

Habeas review of state jury instructions is very narrow because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnote omitted). The question in this proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process. *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155. The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial. *United States v. Frady*, 456 U.S. 152, 169 (1982).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995).

Here, the court finds the jury instructions did not deprive petitioner of a fair trial. Therefore, this ground for relief fails.

**Ground II: Sufficiency of the Evidence**

In Ground II petitioner claims the evidence was insufficient to support her conviction, because the jury had to rely on the incredible testimony of a child who was four years old when the abuse occurred. He was six years old at the time he testified at trial. Petitioner does not dispute that the boy was abused, but asserts his testimony about her was unworthy of belief.

On direct appeal the OCCA dismissed her claim as follows:

> The trial evidence was sufficient for any rational trier of fact to find that Smith committed child abuse, enabled child abuse and child neglect beyond a reasonable doubt. Smith also challenges the testimony of the victim as so incredible that it must be corroborated. "Where there is a conflict in the testimony, it is the exclusive province of the jury to weigh the testimony and draw their conclusion there from, and if there is any competent evidence to support their verdict, it will not be disturbed by this Court." Even if the victim's testimony needed to be corroborated, the evidence and testimony of the State's other witnesses was sufficient to corroborate the victim's testimony.

*Smith*, slip op. at 2-3 (footnotes and citations omitted).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court repeatedly has emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as

long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

To determine whether there was sufficient evidence presented at trial to sustain petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The applicable statutes provide as follows:

The elements of Child Abuse are:

First, a person **willfully/maliciously** engaged in;
[Second, **injuring/torturing/maiming**;
Third, of a child under the age of eighteen.]
**OR**
[Second, harm/(threatened harm);
Third, to the **health/safety**;
Fourth, of a child under the age of eighteen;
Fifth, by a person responsible for the child's **health/safety**.]

**Harm/(Threatened harm) includes, but is not limited to (select from the following): (nonaccidental physical/mental injury), sexual abuse, sexual exploitation, neglect, failure/omission to provide protection from harm.(threatened harm).**

Instruction No. 4-35, OUJI-CR(2d) (Supp. 2000); Jury Instruction No. 7.


The elements of Child Neglect are:

First, a person responsible for the child's health or safety;
Second, **willfully/maliciously**;
Third, **failed/omitted** to provide;
Fourth, **(adequate food, care, shelter, medical care, and supervision)**;
Fifth, for a child under the age of eighteen.

Instruction No. 4-37, OUJI-CR(2d) (Supp. 2000); Jury Instruction No. 9.

The elements of Enabling Child Abuse are:

First, a person responsible for a child's health or safety **willfully/maliciously** engaged in;
Second, **causing/procuring/permitting a willful/malicious**;
Third, act of **harm/(threatened harm)**;
Fourth, to the **health/safety**;
Fifth, of a child under the age of eighteen.

Instruction No. 4-36, OUJI-CR(2d) (Supp. 2000); Jury Instruction No. 8.

The record shows that Officer Billy Mack White, Assistant Police Chief of Gore, Oklahoma, testified that he went to petitioner's house on June 24, 2005, in response to a call from the Oklahoma Department of Human Services (DHS) to conduct a welfare check. (Tr. 103-04). He found petitioner, her daughter, and R.K., a four-year-old boy. (Tr. 104, 110). Petitioner said she was babysitting R.K., and Officer White told her he had a report that R.K. had a black eye. (Tr. 104-05). Petitioner called R.K., who appeared with a black eye and "looked like a little feeble old man walking" toward Officer White. (Tr. 105). R.K. appeared to be underweight, and it was determined when he was taken to the hospital later that day that he weighed only 26.9 pounds. (Tr. 105, 268). R.K.'s hair was very thin, and there appeared to be tape residue on his hands and around the back of his neck, across his ears. (Tr. 107, 138). Petitioner told Officer White that R.K. had been playing with a weight and dropped it on his eye, and R.K. had hurt his feet by rolling rocks around in her yard. (Tr. 105, 111).

Officer White called DHS to report an emergency situation, and DHS Child Abuse Investigator Martin Lincoln came to the house to talk to R.K. while White took photographs. (Tr. 106, 133, 142, 247). Lincoln testified there had been eight prior referrals to DHS about alleged neglect or abuse of R.K. or his siblings. (Tr. 155). He observed multiple bruises on R.K. and tape residue on his hands and the back of his neck. (Tr. 145). R.K. also had "almost blister-like tears on his feet," and his face appeared sunken. (Tr. 145). He looked malnourished and even dehydrated, and he had difficulty walking down the steps toward Lincoln. (Tr. 146). It also appeared that patches of his hair either had fallen out or had been

6

ripped out. (Tr. 147). R.K.'s mother Melanie Smith and Roy Smith, presumably Melanie's "husband or live-in," showed up at petitioner's house during the investigation. (Tr. 134, 152). Melanie also was described by a witness as Roy's "half-sister slash girlfriend." (Tr. 258).

Petitioner had started babysitting R.K. around the first week of May 2005. (Tr. 364-65). She denied any knowledge of R.K.'s bruising on his torso, but claims the bruises on his face were from a fall. (Tr. 147). She said she punished him by spanking and by making him stand in a corner with his hands over his head. (Tr. 146). R.K. was placed in DHS custody. (Tr. 147). Lincoln testified that R.K.'s case was a near-death situation. (Tr. 150).

Officer White and another DHS worker took R.K. and left for the emergency room of the Sallisaw hospital. (Tr. 110, 148). As soon as they got in the vehicle, R.K. asked for a drink of White's pop. (Tr. 110). Officer White stopped the vehicle on the way to the hospital, carried R.K. into a Short Stop, and bought him a 20-ounce juice drink, which he drank before they got to Vian. (Tr. 110, 117). They then went to McDonald's where Officer White bought R.K. a Happy Meal, and R.K. drank the pop before they got to the hospital. (Tr. 110). At the hospital, R.K. ate his cheeseburger and fries with grape juice, and the emergency room physician testified he ate the burger "as quickly as I've ever seen a child eat anything." (Tr. 110, 270).

At the hospital Officer White observed that there was not one part of R.K's body without bruising, counting 17 bruises on just one side of his bottom. (Tr. 112-13). When Officer White left the hospital, he arrested petitioner, R.K.'s mother Melanie Smith, and Roy Smith. (Tr. 118, 140). A search of petitioner's house few days later revealed handcuffs, barbells, a roll of black electrical tape, and a roll of packaging tape in petitioner's house. (Tr. 118-19, 123, 130-31). The weights were in petitioner's bedroom where R.K. said they were located. (Tr. 215). Petitioner said she had the handcuffs because she used to be a prison guard or corrections officer. (Tr. 222). What appeared to be human hair and adhesive were on one of the weights. (Tr. 139-40, 216). The black tape was consistent with R.K.'s

statement that the tape was put around his mouth and was used to hold the weights on his arms, ankles, and knees. (Tr. 216).

R.K. was six years old when he testified at petitioner's trial. (Tr. 167). He described petitioner as "[t]he one that being mean" to him, because she hit him on both his feet with weights. (Tr. 167-70). He also testified that petitioner taped the weights to his feet. (Tr. 171). She and her daughter Brenna also put the duct tape across his mouth and eyes to keep him quiet in the closet and when she hit his feet. (Tr. 171-72). He identified the handcuffs and said petitioner and Brenna had put them on his hands to keep him from touching things, and the handcuffs also had been on his ankles (Tr. 172-73).

R.K. further testified that on the days he was at petitioner's house, he received only breakfast consisting of Ramen noodles, animal crackers, and mush and water. (Tr. 174-75, 241). He was not given much to drink and was thirsty when petitioner babysat him. (Tr. 175). He asked her for more to drink, but she did not want him to drink. (Tr. 175). On cross-examination R.K. testified that Roy Smith, who he called "Mean Daddy," spanked him with a belt and handcuffed his ankle to a couch at his mother's house. (Tr. 176-78).

Muskogee County Sheriff's Deputy Jan Ray testified he first met R.K. in the office of Dr. Stratton, a Muskogee County pediatrician who specializes in child abuse cases. (Tr. 199-201). One admitted photograph taken by Deputy Ray showed R.K. with a cane in his hand that he used because of his difficulty in walking. (Tr. 201-02, 225-226, State's Ex. 34). Another photograph depicted bruising and tape residue on the back of R.K.'s head. (Tr. 202-03, State's Ex. 35). R.K. told Deputy Ray that the tape came from "Mean Sharon's." (Tr. 203). The next photograph also showed tape residue and documented R.K.'s hair falling out. (Tr. 203-04, State's Ex. 36). Other photos showed tape residue on his ears that R.K. said had resulted from "Mean Sharon" taping him. (Tr. 204-05, State's Ex. 37-38).

Deputy Ray further testified that when she walked into Dr. Stratton's office, R.K. was on the examining table. (Tr. 205). R.K. pointed to her handcuffs and said he knew what they were, calling them "handcuffies." (Tr. 205). He then spontaneously said, "They're what

8

Sharon and Melanie put--he pointed to his ankles and his feets [sic]." (Tr. 205-06, 228).
R.K. later saw Deputy Ray's handcuff key on her key ring, and when asked to identify what
it was, he said it was a handcuffie key like the one Sharon and Melanie used to remove the
handcuffies from his feet. (Tr. 255). Through a two-way mirror, Deputy Ray observed and
heard R.K. tell Dr. Stratton that "Mean Sharon stomped his feet and . . . tied his hands with
the tape and that he dropped the weights on his feet. That's how he was hurt." (Tr. 207,
231).

After R.K.'s examination in Dr. Stratton's office, he was taken to Kids' Space for the
first of two interviews with Deputy Ray present. (Tr. 206). R.K. said the bruises on his arms
were caused from his getting "really, really tired when he had to hold the weights above his
head." (Tr. 218). After the first interview, Deputy Ray asked R.K. what he would like for
lunch and he requested mashed taters. (Tr. 212-13). He said that was what he wanted to eat,
because Sharon ate mashed taters, but he never got any. (Tr. 213).

Dr. Mark Callery testified he was employed as a physician at Sequoyah Memorial
Hospital in Sallisaw when R.K. was taken to the emergency room. (Tr. 260-61). R.K. had
swelling and bruising of his feet, as well as bruises over his entire body, and he was very
malnourished and hungry. (Tr. 261). His legs were very thin. (Tr. 261). R.K. told Dr.
Callery that Sharon had stepped on his feet. (Tr. 262). This explanation was consistent with
some type of blunt trauma, "whether it be somebody stepping on his feet or something else
heavy being smashed onto it or something like that." (Tr. 262). R.K. appeared wasted, and
his muscles appeared to have been previously more developed. (Tr. 262). Also, his skin was
sagging, as though he had not had enough to eat. (Tr. 262). His hair had several bald
patches, a symptom that also is consistent with malnourishment. (Tr. 263). There appeared
to be tape residue around the back of his head. (Tr. 263). Hospital records from R.K.'s
emergency room visit two months earlier showed he had lost two pounds since his prior
examination. (Tr. 268). It is not normal for children of R.K.'s age to lose weight. (Tr. 268).
R.K.'s pulse was a little high for his age, possibly caused by dehydration. (Tr. 269). Dr.

Callery testified that this was the worst case of child abuse he had seen in his career. (Tr. 269). He determined that R.K.'s malnourishment could have been life-threatening, but he was expected to survive that night, because he still was able to feed himself. (Tr. 273).

Defense witness Patricia Munholland, a licensed practical nurse and petitioner's friend, testified she saw R.K. in petitioner's house on two occasions. (Tr. 284-86). According to Munholland, petitioner asked her whether R.K. was small for his age. (Tr. 287). Munholland lifted him up and told petitioner that she though R.K. was small. (Tr. 287). R.K. seemed happy, not scared or upset, and she observed R.K. playing with petitioner's grandson. (Tr. 287). Munholland did not see any bruises on R.K.'s face. (Tr. 288). She did not see him eat or drink anything during her visits that lasted 15-20 minutes. (Tr. 287-88).

Rhonda Koch, a DHS worker who also testified for the prosecution that she took photographs of R.K. at the hospital, testified for the defense that she knew petitioner in 2002 or 2003, when she took senior pictures of petitioner's daughter Keisha. (Tr. 193-99, 291). Koch testified she had a conversation with petitioner or Keisha about their concern for a person they knew. (Tr. 292). Neither petitioner nor Keisha, however, made a referral regarding R.K. (Tr. 292-93).

Alona Brady who is Melanie Smith's cousin and petitioner's niece, testified that R.K. lived with her for a about a year and a half, because Melanie could not handle him. (Tr. 294-95, 303). Ms. Brady said that about a month before petitioner started babysitting R.K., she warned petitioner not to babysit him, because Melanie was mean to him and did not feed him. (Tr. 297-98). Ms. Brady called the welfare office to report Melanie's abuse and neglect of the child. (Tr. 298).

After R.K. was back with his mother and petitioner was babysitting him, Ms. Brady visited petitioner's house about four times a week. (Tr. 299-300). R.K. played with Ms. Brady's son during the visits, and there was one incident in which they found a weight and were playing with it. (Tr. 300). Petitioner told the boys not to pick up the weights or they

would get hurt. (Tr. 300-01). Brady also testified she observed petitioner feeding R.K., including the times they ate Indian tacos and had food at a birthday party and a baby shower. (Tr. 301). R.K. did not seem afraid of petitioner or petitioner's family, and she never saw petitioner physically or verbally abuse R.K. (Tr. 302-03). She stated the last time she saw R.K. at petitioner's house, it was about four days before he was taken into DHS custody, and he did not have the bruises shown in the photographs in evidence. (Tr. 309-10). Ms. Brady admitted her own children were in DHS custody. (Tr. 307).

Alona Brady's 16-year-old daughter Jennifer Brady testified she saw Melanie physically abuse R.K. when R.K. was two years old. (Tr. 317, 320). She also saw R.K. at petitioner's house, where he ate a breakfast of biscuits and gravy or eggs. (Tr. 319-20). She never saw him being taped or forced to hold weights above his head. (Tr. 320).

Carlyn Abercrombie, petitioner's sister, testified she saw him at petitioner's house a couple of times. (Tr. 331, 336-37). R.K. ate whatever everybody else was eating, such as tacos and potatoes, and he drank Kool-Aid and tea. (Tr. 332). She had no concerns about petitioner's babysitting him, and he seemed happy. (Tr. 332-22). She stated she never saw R.K.'s bruises, tape residue, or foot injuries. (Tr. 336-337, 338). She further claimed he was at her house at 10:00 p.m. the night before he was taken into DHS custody, and he had no difficulty walking. (Tr. 338).

Jennifer Hutchison testified she was the manager of the Wal-Mart portrait studio in Sallisaw, and in 2004 or 2005 petitioner brought R.K. to the store almost every day and had pictures taken about every two weeks. (Tr. 340-42, 344). He was quiet during the photography sessions, but otherwise was talkative and playful. (Tr. 342). He seemed to love petitioner. (Tr. 343).

Petitioner's daughter Keisha Smith testified that she and petitioner anonymously called DHS about a year or two before June 2005 to report that R.K. had a black eye. (Tr. 362-63). Petitioner began babysitting him Monday through Friday in May 2005, so he would have something to eat at least once a day. (Tr. 366-67). Melanie and Roy would drop him

off around 1:00-2:00 p.m. and pick him up around 10:00 p.m. (Tr. 368-69). He was fed a variety of foods and something to drink. (Tr. 370). They went to Wal-Mart almost daily, and on their way home, they would stop somewhere to eat dinner. (Tr. 370-372). On the evenings they ate at home, Keisha made dinner that R.K. called mush. (Tr. 372-73). Shortly before his mother was supposed to pick him up, he was offered a snack. (Tr. 373). There never was a day when he was not given food, and he received extra food on Mondays and Fridays to make up for weekends (Tr. 374, 393-94).

Keisha testified she bought the weights at a yard sale to use for physical therapy after her knee surgeries. (Tr. 374-75). The tape residue was on them when they were purchased. (Tr. 375). During the time in question, petitioner had indoor cats and dogs at her house, and there was animal hair everywhere. (Tr. 375-76). R.K. watched Keisha use the weights for her physical therapy, and he wanted to play with the weights. (Tr. 377-79). Petitioner told him to be careful not to drop them. (Tr. 379).

Petitioner's handcuffs were from her time as a security guard at the Houston Astrodome, but the key had been missing since 1991. (Tr. 379-80). Keisha claimed petitioner wanted to sell the handcuffs to her friend Jerry Fields, the Gore Chief of Police, but there was no key to unlock them. (Tr. 380-81). Petitioner told R.K. not to mess with them, because she did not want them to get stuck on him. (Tr. 381). The black electrical tape was used to fix the washer, but was not put on R.K. (Tr. 381). The packaging tape was borrowed to mail photographs, but Keisha did not put it on R.K. (Tr. 382). In fact, the tape was not in petitioner's home during the time she babysat R.K. (Tr. 382).

Keisha testified she observed R.K. injuring himself by pinching his arm. (Tr. 386). She thought the tape residue on the back of his neck was dirt, but Melanie would not allow him to be bathed at petitioner's house. (Tr. 387-88). As for the garden rocks, R.K. tried to play with them, but petitioner stopped him. (Tr. 388). He did try to pick up one, and it fell on his foot. (Tr. 388-89). Keisha never saw R.K. without his shirt and pants, so she had not seen his body as it was shown in the photographs. (Tr. 390). R.K. had no difficulty walking

until the day DHS came to the house. (Tr. 390). She and her mother did not call DHS again about Melanie's abuse, because they feared she would take R.K. and they never would see him again. (Tr. 392).

Keisha denied R.K.'s claim that she had whipped him with a belt, saying she would not touch him "because he looked like he would break." (Tr. 394-95). Also, she never saw her sister Brenna or petitioner spank him, and no one taped him or put handcuffs on him. (Tr. 410-11). She further denied anyone ever making R.K. hold weights over his head. (Tr. 431).

The State recalled Officer Billy Mack White, who testified that the key for one pair of handcuffs is usually interchangeable with different handcuffs. (Tr. 413). Officer White used his handcuff key to lock and unlock his own cuffs and then locked and unlocked the cuffs found in petitioner's home. (Tr. 413-14). Gore Police Chief Jerry Fields testified he had known petitioner for more than 30 years, and she never had approached him about selling him a set of handcuffs. (Tr. 415-16). Rhonda Koch also was recalled and testified that on the day DHS took custody of R.K., Keisha Smith told her that petitioner made him carry rocks as punishment. (Tr. 417).

After careful review of the record, the court finds no merit in this ground for habeas corpus relief, because the decision by the OCCA was consistent with federal law and was not an unreasonable determination of the facts, based on the evidence presented at trial. *See* 28 U.S.C. § 2254(d). All the elements for each crime were proven by the prosecution. To the extent petitioner is claiming the evidence was insufficient, because R.K.'s testimony was incredible, contradicted by other witnesses, and uncorroborated, she has cited no authority for this argument. As set forth by the OCCA, even if corroboration were necessary, R.K.'s testimony was corroborated by testimony from other witnesses and the physical evidence in the case.

## Ground III: Prosecutorial Misconduct

Petitioner next complains the prosecutor made two prejudicial and improper remarks to the jury that resulted in the denial of a fair trial. Petitioner claimed in her direct appeal that

the prosecutor made an improper appeal to societal alarm when he said the following in his opening statement about Assistant Police Chief White's arrival at petitioner's house:

> What Officer White saw stunned him. Out of Smith's house limped a tiny four-year-old boy, R.K., who looked like a survivor of a Nazi prison camp.

(Tr. 100).

Petitioner also alleges the prosecutor improperly vouched for the victim in his closing argument:

> . . . Listen to R.K. He's telling the truth. He's the eyewitness that they're looking for. Who better than the victim himself. If we can't rely on him, who can we rely on.

(Tr. 434).

The Court of Criminal Appeals denied relief on this claim:

> Smith alleges that two instances of prosecutorial misconduct deprived her of a fair trial. The first alleged instance of misconduct was not an attempt by the prosecutor to raise societal alarm in his opening statement, but was fair comment on photographs that were later admitted to evidence. Because the prosecutor neither explicitly or personally assured the victim's credibility, nor relied on evidence that was not admitted to bolster his testimony, the second alleged instance was not error.

*Smith*, slip op. at 3 (footnotes and citations omitted).

> In a habeas corpus action, claims of prosecutorial misconduct are reviewed only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). In order to be entitled to relief, [petitioner] must establish that the prosecutor's conduct or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after considering all of the surrounding circumstances, including the strength of the state's case. *See Darden*, 477 U.S. at 181-82.

*Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005), *cert. denied*, 547 U.S. 1181 (2006).

Here, the court agrees with the OCCA's determination that petitioner was not deprived

of a fair trial. The comment about R.K.'s appearance when Officer White came to petitioner's house was descriptive of the photographs, and the comment in the closing argument was not improper. Because there was no denial of due process, Ground III of this petition is meritless.

## Ground IV: Ineffective Assistance of Trial Counsel

Petitioner alleges her trial counsel was ineffective in failing to object to jury instructions, submit proposed written instructions, and object to prosecutorial misconduct. The OCCA found no error:

> Smith claims she received ineffective assistance of counsel because of trial counsel's failure to object and request certain jury instructions. As discussed above three terms complained of were defined as elements, [and] trial counsel will not be found ineffective for not requesting unwarranted instructions. Nor was Smith prejudiced by trial counsel failing to request three other terms be defined. Smith's attorney was not deficient when he did not object to the alleged instances of prosecutorial misconduct, because neither instance was misconduct.

*Smith*, slip op. at 3 (footnote and citation omitted).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.

The OCCA was correct in its decision about this claim. Failure to present a meritless argument does not constitute ineffective assistance of counsel. *Martin v. Kaiser*, 907 F.2d 931, 936 (10th Cir, 1990) (citing *Strickland*, 466 U.S. at 691-96). Because there was no error in the trial attorney's alleged failures, petitioner was not denied her right to effective counsel.

**Ground V: Cumulative Error**

Finally, petitioner asserts the trial errors cumulatively denied her a fair trial. The OCCA found no merit in this claim. *Smith*, slip op. at 4 (footnote and citation omitted). "Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." *Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.) (quoting *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998). As discussed above, there were no constitutional errors in Grounds I-IV of this petition. Therefore, there can be no cumulative error, and Ground V also fails.

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 5th day of February 2013.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE